IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| STANLEY HOLLAND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-0275-CV-W-NKL-SSA |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

Pending before the Court is Plaintiff Stanley Holland's Motion for Summary Judgment [Doc. # 14]. Holland seeks judicial review of the Commissioner's denial of his request for disability benefits under Title II of the Social Security Act. The Administrative Law Judge ("ALJ") found that Holland was not entitled to benefits, and such determination became the final decision of the Commissioner when the Appeals Council denied Holland's request for review. Holland has exhausted his administrative remedies, and jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 405(g). The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] Because the Court finds that the ALJ's decision is

---

[1] Portions of the parties' briefs are adopted without quotation designated.

1

supported by substantial evidence in the record as a whole, Holland's Motion for Summary Judgment will be denied.

## I. Background

Holland filed his application for disability benefits on April 21, 2003. (Tr. 20.) He was born in 1952 and was between 48 and 53 years old at all times relevant to this Order. (Tr. 20.) Holland has an eleventh grade education and past relevant work experience as a cleaner and warehouse worker. (Tr. 20, 403, 435-36.) He lives with his wife and two teenage children. (Tr. 402-03.)

Holland testified that he last worked in 2001 loading trucks at a department store. His employment ended after he slipped on some ice and broke his arm. (Tr. 405.) Holland has worn a brace on his wrist since he broke his arm. (Tr. 406.) Holland testified to continuing problems with his arm: "Well, I go to pick up stuff, and I can't, plus I got a bad finger. I got about three fingers on this hand that I can use." (Tr. 407.) He further testified that he can pick up a pen and reach into a cabinet and get out a can of soup, but he cannot pick up a 12-pack of soda. (Tr. 407-08.) Holland initially alleged that he became disabled December 2001 due to the wrist injury.

Holland testified that he takes medication to counter swelling in his ankles, which happens when he stands. (Tr. 409.) He also testified that he can walk for about 20 minutes and stand for about 10 or 15 minutes before having to sit down, but that he also has trouble sitting. (Tr. 410.) Heat and cold bother Holland. Fumes, odors and vibrating vehicles all give him a headache. (Tr. 411.) Holland testified that he will help his

2

children get ready for school, but does not do any housework or yard work and does not exercise. (Tr. 413-15.) He also testified that he has problems with his short term memory. (Tr. 414-15.)

Holland also testified to certain mental impairments. He testified that he hears voices all the time. He further testified that his neighbors put a microphone in his apartment: "Well, I - - they said I was going to work, and they had hung it out the window. And they got my voice on it and the voice has been everywhere I've been ever since." (Tr. 418.) He further testified that the voice goes with him everywhere he goes and affects his concentration, "They affect everything I do. Raising my kids. Talking to somebody." (Tr. 418.) Holland testified that the voices normally just make a lot of noise, but once they told him to commit suicide. (Tr. 418.) He claims that the voices have made raising children more difficult and made his job as a mechanic all but impossible. (Tr. 420.) Holland testified that his conversations, which were sometimes profanity-laden, with the voices in his head hindered his ability to work. (Tr. 420-21.)

Holland indicated that he sleeps in a chair because the voices in his bed are so loud that he cannot sleep. (Tr. 424-25.) He further testified that, because of the voices, he only sleeps two or three hours a night and sometimes not at all. (Tr. 425.)

Holland's wife also testified to Holland's mental impairments: "His main problem - - it, it started about, I'd say about four years ago. He's schizophrenic, sitting up and talking to his self with me in the room, real loud, about people, and I'm trying to watch television, and he just come to his self about - - probably about me sometime. And I

3

looked at him and ask him, what you say? He said, I ain't saying nothing. I wasn't talking to you." (Tr. 429.) According to Ms. Holland, her husband still hears the voices even though he is on medication. (Tr. 432.)

### A. Medical Records of Holland's Mental Impairments

Holland first complained of schizophrenic symptoms during his December 2, 2003, consultative examination with Dr. Majure-Lees. (Tr. 162.) Dr. Majure-Lees also noted that Holland gave a history of depression and hearing voices, but she noted that he was "able to communicate well and follow directions well." (Tr. 165.) She further noted that Holland's mood and affect were normal, and that he was able to perform normally on a mini-mental status examination. (Tr. 165.) An appended form titled "Mini-Mental Status Examination" notes that Holland received a perfect score on all of the simple tasks that make up the test, including reciting serial sevens backwards from 100, which is a test of attention and concentration. (Tr. 170.)

A July 2005 intake form from ReDiscover Mental Health & Substance Abuse Centers shows that Holland stated that he wanted a "clean mind," and that he wanted the "voices to stop so he can sleep." (Tr. 233.) The person who completed the form noted that Holland seemed to have poor memory and concentration, as well as reduced speech. (Tr. 232.) Holland also reported suspiciousness. (Tr. 232.)

At an August 2, 2005, biopsychosocial assessment Holland complained of insomnia, auditory hallucinations, paranoia and depression. He reported that his psychiatric difficulties began in 1986 after a gay couple moved into the apartment below

4

his. He explains that the couple used to spy on him with binoculars and follow him to work. He reports, "I still hear them, I have been hearing them since." Holland's paranoia about the couple caused the client to repeatedly report them to the police. Eventually, the police escorted him to the Western Missouri Mental Health Center, where he was admitted in 1988. (Tr. 236-37.)

Holland explained that while depressed, he feels "down, no motivation, can't concentrate, no appetite, and I have memory loss." In addition, he added that it is particularly challenging for him to deal with stress. Holland's diagnostic impression indicated schizophrenia with a current Global Assessment of Functioning ("GAF") score of 50. (Tr. 236-240.)

Holland underwent an intake examination for psychiatric care on August 2, 2005, conducted by Jennifer Fishman, M.S. (Tr. 236-41.) Tomas Brillantes, M.D., also signed the report on August 25, 2006. (Tr. 241.) Ms. Fishman noted that Holland believed his symptoms began in the mid-eighties, when he believed neighbors were spying on him. (Tr. 237.) He believed he has heard them ever since, but he had not received treatment for the complaints since 1995. (Tr. 237.) Holland denied any significant challenges in living independently. (Tr. 237.) Ms. Fishman's mental status examination revealed that Holland was slightly guarded, but he still appeared to be friendly and interested, and he had an appropriate and stable mood and affect. (Tr. 239.) She also observed that there were "no gross delusions, paranoia, auditory hallucinations, or visual hallucinations

5

Case 4:06-cv-00275-NKL   Document 16   Filed 12/13/06   Page 5 of 13

present." (Tr. 239.) She noted he retained average concentration and intact memory. (Tr. 239.)

Tomas Brillantes, M.D., a psychiatrist, examined Holland on August 25, 2005. (Tr. 234-35.) Holland told Dr. Brillantes that he had been hearing voices since 1986, adding that he believed people were screaming at him. (Tr. 234.) He said he sought treatment until 1995, but that he had not taken medication for 10 years and the "voices [were] back harassing him." (Tr. 234.) Upon examination, Dr. Brillantes observed that Holland was dressed neatly, he maintained good eye contact, and that he was cooperative and pleasant. (Tr. 235.) He appeared to have reduced motor activity, but his speech was normal, and he denied feeling depressed. (Tr. 235.)

According to the Medical Source Assessment prepared by Dr. Brillantes, Holland is not able to do any of the following: remember instructions and work like procedures; understand, remember or carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule; maintain regular attendance or be punctual with customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and work week without interruptions from psychological based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; be aware of normal hazards and

6

take appropriate precautions; travel in unfamiliar places or use public transportation; or set realistic goals or make plans independently of others. (Tr. 394-95.)

He showed some paranoid tendencies, but his thought processes otherwise did not show any loose associations or flight of ideas. (Tr. 235.) Holland had a "fair" fund of knowledge and he could interpret proverbs, but he had difficulty completing the serial sevens test. (Tr. 235.) Dr. Brillantes estimated Holland's intelligence was average at best, and his insight and judgement were fair. (Tr. 235.) Holland was willing to take medication. (Tr. 235.) Dr. Brillantes diagnosed Holland with chronic paranoid schizophrenia and assigned him a Global Assessment of Functioning Score of 45 to 50. (Tr. 235.) Dr. Brillantes also prescribed medication. (Tr. 235.)

## II.     Discussion

To establish that he is entitled to benefits, Holland must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d) and § 1382c(a)(3)(A). Holland has not met this burden.

After consideration of the record, the ALJ determined that Holland suffered from schizophrenia, a history of alcohol abuse, status-post right wrist fracture, a profound injury of the right fifth finger, and intermittent edema of the bilateral ankles, which were "severe" under the meaning of the Act. (Tr. 21.) The ALJ determined that Holland's impairments did not constitute an impairment or combination of impairments listed in or

medically equal to one contained in 20 C.F.R. § 404, Subpart P, Appendix 1, Regulations No. 4. (Tr. 33.)

When determining Holland's residual functional capacity, the ALJ concluded that Holland was precluded from detailed or complex mental job tasks, but could do simple, unskilled, repetitive job tasks. (Tr. 34.) Also, he did not have any significant limitation in his ability to understand, remember, and carry out simple instructions; use simple judgment; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. (Tr. 34.)

Based on his residual functional capacity, the ALJ determined that Holland was unable to perform any of his past relevant work but was able to perform other work found in significant numbers in the national economy, such as duplicating machine operator, intra office messenger, and laundry worker. (Tr. 32.) Consequently, the ALJ determined that Holland was not "disabled" as defined by the Social Security Act. (Tr. 20-34.) Holland's complaints about the ALJ's conclusion that he is not disabled all relate to the ALJ's handling of his mental status. Therefore, the Court only discusses those issues.

### A.  Mental Health Assessment

Holland contends the ALJ inaccurately assessed his mental capacity because the ALJ did not give enough weight to Holland's auditory hallucinations. The ALJ, however, concluded that even if Holland had the auditory hallucinations that he complains of, they are not so bad that he cannot work. *See McGinnis v. Chater*, 74 F. 3d 873, 874 (8th Cir. 1996). Holland's complaints of schizophrenia are longstanding and Holland worked in

the past despite his claim to have suffered from the disease for many years. There is no explanation in the record why Holland's mental condition is different today than it was previously.

There is also little evidence of treatment or restrictions arising from Holland's alleged mental impairments. The ALJ pointed out that Holland originally claimed disability based only on physical symptoms, and that he made no psychological complaints until December 2003, several years after the date he alleged he became disabled. (Tr. 162.) On the record before the Court, it appears that Holland did not seek treatment for these symptoms until even later, in the summer of 2005. (Tr. 228-33.) *See Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (noting that the absence of any evidence of ongoing counseling or psychiatric treatment or deterioration or change in Plaintiff's mental capabilities disfavors a finding of disability). Holland also claimed that he had suffered schizophrenia and heard voices since the mid-eighties, but the ALJ pointed out that Holland had his highest earnings in 1999. (Tr. 28, 70, 234.) *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) ("Here, the ALJ found [the claimant's] speech impediment was not as limiting as alleged because [the claimant] effectively worked as a nurse's aide with her speech impediment and there is no indication that her ability to speak has deteriorated since her stroke in 1997.").

Furthermore, when Holland did tell his doctors that he was hearing voices, none of the examinations revealed any outward sign of hallucinations or any indication that he could not concentrate sufficiently to perform the simple types of work described by the

9

ALJ's residual functional capacity. Dr. Majure-Lees found Holland had a normal mental status examination. (Tr. 170.) Psychiatric counselor Ms. Fishman likewise observed that Holland was friendly and stable, and she made note that he exhibited "no gross delusions, paranoia, auditory hallucinations, or visual hallucinations." (Tr. 239.) She also observed that his concentration and memory were average. (Tr. 239.) Likewise, Dr. Brillantes observed that Holland seemed to be paranoid and that he seemed to have some limitations in concentration, but his thought processes were otherwise normal. (Tr. 235.) None of Holland's medical records suggest that he was ever observed to be responding to internal stimuli, such as auditory hallucinations.

Finally, the ALJ noted significant inconsistencies in various statements by Holland and his witnesses, which negatively impacted the credibility of his subjective complaints. In his decision, the ALJ cited over a dozen inconsistencies between various of Holland's statements and other evidence of record, none of which are disputed by Holland. (Tr. 30-31.) *See Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004) ("We have been careful to explain that an ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances.").

Holland also argues that the ALJ failed to fairly consider the opinion of his treating physician, Dr. Brillantes. (Tr. 235, 241; Pl's Br. at 18.) He specifically criticizes the ALJ for accepting only part of Dr. Brillantes's opinion, pointing out that the ALJ cited Dr. Brillantes' clinical findings, but that he did not assign weight to the doctor's GAF score of 45 to 50, which Holland says represents significant work-related limitation. (Pl's Br.

10

at 18-19.) But, Dr. Brillantes saw Holland only once or twice. Thus, there is little reason to believe that his opinion is due the deference afforded to treating physicians. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (finding letter from medical provider was not entitled to controlling weight as a medical opinion of a treating source because provider had only met with the patient on three prior occasions."); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2) (2006) (more weight given long-term treating sources who have opportunity to develop a "longitudinal" view of the individual's impairments).

Holland also argues that the ALJ improperly relied on a mini-mental status examination conducted by consultative examiner Dr. Majure-Lees. (Pl's Br. at 20.) The ALJ noted that it was significant that Dr. Majure-Lees's simple examination was given during Holland's earliest allegation of significant mental limitations, but that the examination, nevertheless, yielded no evidence of mental limitation. (Tr. 29.)

Next, Holland generally argues that the ALJ failed to fully develop the record. (Pl's Br. at 21.) The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled. *See Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994); 20 C.F.R. §§ 404.1519a(b) and 416.919a(b). Holland does not explain what evidence, in his view, needed to be developed, nor does he point to any evidentiary gaps suggesting the ALJ did not already have all of Holland's information. Finally, neither Holland nor his counsel produced any information suggesting that the ALJ's failure to develop the record prejudiced him. *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir.

11

2005) ("Without informing the court what additional medical evidence should be obtained from [the doctor, the claimant] has failed to establish that the ALJ's alleged failure to fully develop the record resulted in prejudice, and has therefore provided no basis for remanding for additional evidence."). The Court finds no merit in Holland's claim that he was prejudiced by an incomplete record. *See Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995).

Finally, Holland argues that the Appeals Council did not give adequate weight to the mental residual functional capacity completed by Dr. Brillantes, which was submitted after the ALJ had rendered his decision in this case. As discussed *supra*, Dr. Brillantes had just begun treating Holland at the time the forms were completed (Tr. 11), and there are few actual treatment notes from the doctor, suggesting his opinion is not due the deference that a long-term treater would be accorded.

In addition, the extreme limitations found on the form are inconsistent with the medical reports in the record. For example, one form indicates that Holland has "poor to no" ability to concentrate, but none of the reports discussed above make mention of any observable deficit of that magnitude. (Tr. 397.) The forms also indicate that Holland had severe difficulty behaving in a socially appropriate manner or adhering to basic standards of neatness or cleanliness, but all of the reports of Holland's appearance (including that of Dr. Brillantes) indicate that he was dressed neatly and related to others well. (Tr. 235, 239, 394.) Given these inconsistencies, the Appeals Council's decision to afford little weight to the medical source forms was not unreasonable. *See Goff v. Barnhart*, 421 F.3d

12

785, 790–91 (8th Cir. 2005) ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion.").

      **B.**    **Vocational Expert**

Holland argues that the ALJ's hypothetical question to the vocational expert did not accurately describe his mental impairments. (Pl's Br. at 25.) Although the hypothetical question must set forth with reasonable precision the claimant's impairments, *Starr v. Sullivan*, 981 F.2d 1006, 1008 (8th Cir. 1992), it need only include those impairments and limitations found credible by the ALJ. *See Pertuis v. Apfel*, 152 F.3d 1006, 1007 (8th Cir. 1998); *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997). As discussed *supra*, the ALJ had a basis in the record for his findings concerning Holland's mental condition. He was not required to include all the complaints alleged by Holland. *See Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005). Therefore, the ALJ's residual functional capacity determination was proper.

**III.**    **Conclusion**

Accordingly, Holland's Motion for Summary Judgment [Doc. # 14] is DENIED.

IT IS SO ORDERED.

                                          s/ Nanette K. Laughrey
                                          NANETTE K. LAUGHREY
                                          United States District Judge

Dated: December 13, 2006
Jefferson City, Missouri